## Hawkins v. Hawkins.

(Decided February 15, 1924.)

Appeal from McCracken Circuit Court.

1. Divorce—Chancellor Held to Have Erred in Granting Divorce and in Allowing Alimony.—Chancellor erred in granting a divorce to wife and in allowing alimony in any sum on the ground of cruel and

inhuman conduct, where it appeared that plaintiff had no other motive in view in marrying defendant than to secure every ease, luxury, and comfort obtainable for herself and family and to give to her husband as little affection and pleasure and association as possible, and it appearing that he did all in his power to make her happy.

2.   Divorce—Court of Appeals May Not Disturb Divorce Decree, but may Determine Right of Wife to Alimony.—While the Court of Appeals cannot disturb a decree of divorce, it has jurisdiction to examine the facts of the case in order to determine the wife's right to alimony.

3.   Divorce—Husband Not Required to Pay Alimony.—Though a husband found at fault in action for divorce or maintenance is bound to provide for his wife in such amount as circumstances will permit, he should not be required to pay any alimony when it is shown that the wife exhibited an utter and reckless disregard of the obligations she assumed at the altar and proved wholly wanting in any of the tender and loving attributes necessary to domestic happiness.

NICHOLS & NICHOLS and WHEELER & HUGHES for appellant.

MOCQUOT, BERRY & REED for appellee.

OPINION OF THE COURT BY JUDGE ROBINSON—Reversing.

Herbert Hawkins and Geneva Riley were married in Minneapolis, Minnesota, December 25, 1915, and shortly thereafter left on an extended bridal tour to Havana, Cuba, via Chicago, New Orleans and Jacksonville, Florida, and after remaining there a few days started on their homeward journey, with Paducah, Kentucky, as the objective point, at which place appellant had lived for a number of years; but upon reaching St. Louis, appellee expressed a desire to return to Minneapolis, where her mother lived, in order that she might visit her before joining appellant. She remained in Minneapolis some two weeks, and upon reaching Paducah they rented an apartment, residing there until a home was finished, the erection of which appellant had begun shortly after the marriage, and when completed some months later moved there. It seems they at once started on an exceedingly rough and tempestuous matrimonial voyage, which, however, from the evidence really began the day after the marriage in Minneapolis and continued with but few interruptions until their divorce some years later.

It appears from the evidence that appellee on numerous occasions threatened to file suit for divorce and frequently consulted her attorneys relative to it, but that appellant on each occasion, by dint of much persuasion accompanied by promises of gifts, induced her to refrain; but finally on March 26, 1921, she instituted an action, alleging cruel and inhuman conduct as the grounds upon which she based her plea for an absolute divorce from appellant and for alimony in the sum of $15,000.00. After many depositions were taken judgment was rendered at the April term, 1922, of the McCracken circuit court, granting her the divorce sought, with alimony of $3,-600.00, and allowing her to retain all of the jewelry, silverware, cut glass and many other articles that had been acquired by her through gifts from her husband or purchase since their marriage, also attorney's fee in the sum of $750.00, and from the judgment granting alimony this appeal is prosecuted.

In her testimony appellee complains that appellant began to mistreat her very shortly after their marriage; that he was cruel, brutal and vicious; that he had an ungovernable temper, and when aroused would frequently choke, bruise and assault her with apparently no provocation whatever, by reason of which she was made exceedingly nervous and almost a physical wreck. Her testimony is substantiated in some details by her mother, who lived with them during a considerable portion of their married life, and she was further corroborated to a mild degree by Mrs. Mae Roark, a friend who resided in Paducah near her.

In an endeavor to contradict the testimony of appellee and her mother (Mrs. Mae Riley) and of Mrs. Roark, appellant, besides his own evidence, introduced a number of citizens in Paducah who had known him the greater part of his life, also three servants who had been employed in and about the premises for a number of years; and after an exceedingly careful review of the depositions filed and an analysis of the testimony offered, we are at rather a loss to comprehend upon what the court relied in granting a divorce in this action.

From her own testimony, as well as that of numerous witnesses, it would appear to us that appellee had no other motive in view in marrying appellant than to secure every ease, luxury and comfort obtainable for herself and family and to give to her husband as little affection and pleasure and association as possible. In her deposition

she admits that within two weeks after their marriage she found it necessary to go to Minneapolis to visit her mother; and throughout their married life it appears that she was not with her husband much more than half the time, though nowhere does it appear that he ceased to anticipate her wishes and preferences regarding practically everything in which her pleasure or happiness might be concerned. If in the midst of little difficulties during their married life, which will, though often unnecessarily, creep into the lives of all, she used such language or slapped his face when the spirit so willed—as she freely admits—or directed such insulting and vicious epithets toward the attorneys who cross-examined her as we find in the depositions, she would scarcely be justified, or appear consistent, in complaining of marital difficulties, for which in many instances she seemed responsible; and from a further reading of the testimony it is rather conclusively shown that appellee possessed little or no regard for appellant's happiness or desire to surround his life with the many little acts, inconsequent at the time but in the aggregate so necessary toward cementing that good comradeship so essential to a perpetuation of marital felicity.

It appears that she never lost an opportunity to leave appellant's home with others and visit different sections of the country, especially if this could be accomplished without the apparently unpleasant society of her husband, who, it seems, would always be relegated to the rear for more congenial company, many of whom were not of a character pleasing to appellant. Appellee complains most bitterly of an incident that happened on the street in Paducah, when she and her mother were approaching a car that they had left at the curb. Appellant appeared upon the scene and entered the car with the apparent design of driving away, but before he could do so appellee's mother jumped into the car and demanded that he stop, and upon his failing to obey, she fell upon him and began to scratch and claw him in such a tigerish manner that his face was bleeding when he drove to the police station with the intention of having her arrested, but friends induced him to desist, and he then sent her home in a taxicab; and in explaining this episode says he had discovered that his wife, contrary to his wishes or knowledge, had picked up some traveling salesmen on the street and had driven far into the country alone, and

considering the gross impropriety of such conduct, he felt it best to take possession of the car when he found it on the street. Appellee denied the alleged occurrence, but in a deposition of John M. Walton (page 276, transcript) she is flatly contradicted. He testified that he was a traveling salesman living in Memphis, Tennessee, and admits he had met appellee at the country club in Paducah, and one afternoon while walking along the street she stopped her car and invited him to ride with her; that they drove out into the country a number of miles and ran into a mud hole, from which they were extricated by two men and a pair of mules. In this he was corroborated by the testimony of both the rescuers.

As to other alleged cruelty inflicted upon her by appellant in Chicago, where they were visiting, she is not corroborated by the testimony of her own witness, Jack Garry, in rebuttal (page 269, transcript).

It is clearly shown that appellant was utterly reckless and lavish in his expenditure of money wherever and whenever it was conducive to the happiness or pleasure of appellee. True she complains that at one time he failed to give her $2,000.00 that she might go, unaccompanied, for an extended tour of France; but, nevertheless, she admits that later he did take her for a trip over the entire west and north, which he testifies cost him nearly $5,000.00. It is further shown that after taking her to the beautiful home in Paducah he furnished it in the most costly and lavish style, keeping from two to three servants and two automobiles, which seemed at all times to be at her disposal. The linens were of the finest, and from the number of oriental rugs she describes as covering the floors, the splendor of their establishment is apparent. From her testimony it is shown that she had unlimited credit in Paducah and Chicago, and appellant's gifts to her were numerous and costly. Shortly after they were married, besides many other articles of wearing apparel, he gave her a fur coat costing $1,200.00, and at other times jewelry amounting to $7,000.00, although appellee values it at a lesser amount. It is shown, too, that appellant was kind to appellee's brother and exceedingly generous in his dealings with her mother, affording her a home a great part of the time and surrounding her with a degree of comfort and luxury to which it might appear neither she nor appellee had been accustomed and certainly failed to appreciate. Appellant further testified that his wife at times drank to ex-

cess, and although she entered a vehement denial of his allegation, two well known citizens of Paducah corroborated in its entirety this charge.

From parts of appellee's own testimony it appears that she often delighted in saying and doing things embarrassing, humiliating and annoying to her husband, and upon one occasion in. his absence shipped his dogs, of which he was very fond, to her brother in Washington, and refused absolutely to advise him of their whereabouts, denying any knowledge of them; and in all of these acts she seemed to find a willing and dependable ally in her mother. Finally, upon reaching the decision that she would enter suit for divorce and leave his home, she went to a hotel in Paducah, but returned shortly thereafter, when he was absent, with two automobiles, and carried away a great number of articles, including oriental rugs, silverware, linens and other household articles, claiming that they had been given to her and that she did not intend to return them, but exhibited a remarkable inconsistency when she took a bath robe— the only thing, as far as the evidence shows, she had ever given him—offering in explanation that, as she had been the giver, it was her inherent right to claim it.

In view of all the foregoing evidence, which we have carefully considered and weighed, and placing the most charitable construction upon the conduct and acts of appellee as gleaned from her own testimony, as well as others in her behalf, we can reach no other conclusion than the inevitable one that the chancellor erred in granting a divorce to appellee and in allowing alimony in any sum.

In Ford v. Ford, 182 Ky. 135, the court said:

"While the Court of Appeals cannot disturb a decree of divorce, it has jurisdiction to examine the facts of the case in order to determine the wife's right to alimony, as well as her right to the maintenance and custody of her children."

And in Burton v. Burton, 184 Ky. 268, it is said:

"Although the Court of Appeals cannot reverse a judgment of the circuit court granting a divorce, it may review the judgment and facts upon which the divorce was granted."

See also Griffin v. Griffin, 173 Ky. 636, 191 S. W. 458.

We are heartily in accord with the well grounded theory that whenever a husband is proven to have been at fault in an action for divorce or maintenance it is his bounden duty, both morally and legally, to provide for his wife in such amount as circumstances will permit; and when assuming the responsibilities incident to marriage it has been the invariable custom for ages that the stronger of the sex is expected to make provision for the weaker and take upon his shoulders the more weighty burdens that must invariably come; and with that end in view, the courts have exacted of him a rigid observance of each and all his duties, especially those tending toward the proper maintenance and support of the one he has promised to nurture and cherish. However, they will not and should not demand any such strict observance on the part of the husband when it is shown that the wife exhibits an utter and reckless disregard of the obligations she assumed at the altar, or proves wholly wanting in any of the tender and loving attributes necessary to domestic happiness.

After viewing the demeanor of appellee in its most favorable light, we feel that her conduct was such as not to merit either a divorce or alimony; but as appellant did not complain of the amount allowed attorneys for appellee, we shall not disturb the judgment in so far as it relates to that; but in all other respects, including alimony in any sum or any of the articles of a personal nature given appellee, the judgment is reversed.

Judgment reversed.